Please be seated. Good morning, everyone. We have two tandem cases to be heard this morning, and we have two cases on submission. The submitted cases are United States v. Jimenez and Humpirji v. Municipal Credit Union, and we'll take both of those cases on submission. I've been advised that counsel is ready to proceed in Contero v. Bank of America and Hymes v. Bank of America, so that's what we'll do. We'll hear from the appellate. Your Honor, may I remove my mask? Yes. Okay. Thank you. Good morning, Your Honors. May it please the Court. Preemption under the National Bank Act is different from preemption in many other areas of the law. There is no presumption against preemption under the National Bank Act. In fact, in Barnett Bank, the Supreme Court recognized that the National Bank Act ordinarily preempts state law. National Bank Act preemption is different because the National Bank Act is different. Congress originally enacted the National Bank Act near the end of the Civil War in order to facilitate interstate commerce by establishing a national banking system. National banks are instrumentalities of the federal government. They can exercise only those powers granted to them by the federal government and by federal law. And as the Supreme Court recently reiterated in Waters, states can exercise control and impose their laws over national banks only to the extent that Congress has permitted. Could you focus on how New York's interest on escrow law significantly interferes with the exercise of your client's national bank power? Sure. So I think the key case to kind of set the standard for what significant interference is, is Franklin National Bank. And I can talk about that first, or I can jump right ahead and explain what we think are the national bank powers implicated here. I think there's at least two. What the OCC says in their brief, and what they say the significant interference is, is with the national bank's authority to establish escrow accounts, which would include the authority to establish the terms and conditions of escrow accounts. The significant interference occurs with respect to that banking power, what the OCC says in their brief, is because it discourages national banks from establishing escrow accounts. And escrow accounts play an important risk-mitigating role. I'm sorry, Counselor, can I just ask you to clarify, are you suggesting that the standard for interference is discouraging? That's not the standard, but discouraging banks from exercising a power would be sufficient to satisfy the standard of significant interference. And to understand what significantly interfere means, I think it's critical to look to Franklin National Bank. That is a case that the district court looked to. The district court looked to Franklin— Where is the limiting principle, though? Because I can imagine that zoning laws, tax law, criminal laws would also discourage, to use your word. And certainly we know that those aren't all preempted. So I'm interested in how your definition, which is an expansive and very generous one, has some sort of limiting principle. So I think the way to look at it, I don't think there's a way to define significant interference with mathematical precision. I don't think the courts have done that. I don't think the Supreme Court has done that. But what we have is a number of cases applying this standard. And so if we look at those, what we know is that a state law like the one that was at issue in Anderson Bank, that's not enough. There was no significant interference there. There was no preemption. This is why I think Franklin National Bank is such a critical case for us, because that's a case where the Supreme Court said there was a significant interference. And so at the risk of oversimplifying the issue, I think from our perspective, if we can establish that the state law here interferes with the National Bank's exercise of its powers to at least as great, if not greater, of an extent than the state law in Franklin National Bank, then the state law here has to be preempted because the Supreme Court said the state law at issue there was. And of course the state law at issue in Franklin National Bank was a state law that said that national banks and some state banks could not use the term saving or savings in their advertising. When the case came up through the state courts and got to the New York Court of Appeals, there had been an evidentiary record established. And what it showed was that every other national bank in New York complied with the law. They did so by using synonyms to savings and savings. And so that's how they got around the limitation. And what the record showed in the state courts is that there was no harm to the business by using synonyms instead of the terms. And so the New York Court of Appeals said no preemption. The Supreme Court reversed. And the way the Supreme Court looked at it, it started with the express power granted by the National Bank Act, which was the power to take deposits. It said that power, you know, national banks have any incidental power necessary to carry out their express powers. The Supreme Court concluded that advertising your services was an implicit power and a state law that tried to limit the words that you could use in an advertisement was a significant interference. I think an important part of this analysis- And I struggled a little bit with the relevance of Section 1639D to the case, but right now I'm thinking that you could look at that statute and say that it may not address preemption, but it does tell us that the Congress that enacted that provision does not believe that all interest on escrow laws should be preempted because they significantly interfere. So your task then might be to explain why this particular one, this 2% one, is a significant interference. If that's the way I should be thinking about this, correct me if I'm- Yeah, respectfully, I would say that's how we would not look at the issue. And so in 1639 DGC, there's first the question of is that intending to impose an obligation on banks, a new obligation, an independent obligation on banks to pay interest on escrow. And in Luznak, the Ninth Circuit's analysis relied heavily on its interpretation of 1639 DGC as imposing an obligation to pay interest, which it then said that must mean that national banks can pay interest. The district court here, we think, had the better reading of 1639 DGC, which is to say that it doesn't express a view on preemption one way or the other. And then where we think the district court erred was saying that silence shows that Congress didn't intend to create an exception, a loophole for national banks for preemption. But under Barnett Bank, the test is has Congress conditioned the exercise of an express power on an explicit limitation. And so we think the court, the district court, got the misinterpreted or gave the wrong effect to silence on preemption. I want to take the other part of your question is we don't think that provisions of the code, even if they address this issue, should be viewed as a view from Congress of whether or not a particular law is a significant interference or not. That's really the standard the courts apply when Congress hasn't spoken directly to it. When Congress says that a national bank needs to comply with a certain state law, what Congress is doing is granting only a narrow power to the national bank to act. You can act, but only in compliance with state law. It's the significant interference. That's the court's test of which laws will be preempted when Congress hasn't answered that. And so there's no other case, really, other than Lesnak, where any court has tried to discern a congressional view on prevent or significantly interfere based on Congress's choice. If you could help me with something, Counselor. You're not disputing that the touchstone of preemption is congressional intent, right? You agree with that? And you wouldn't dispute that the most probative evidence, perhaps not the only evidence, but the most probative evidence of congressional intent is the text itself? Correct. So why doesn't the fact that the text allow for some type of escrow interest suggest, why doesn't that answer the preemption question even if Congress didn't explicitly say preemption? Because at this point, it certainly was at least Congress's intent to permit some, and then what we need to do is figure out whether or not, accordance with the cases, it was too much. I think what Barnett Bank teaches us is in this area of the law, congressional intent starts with Congress's intent in enacting the National Bank Act. So it's frozen in time. Later, Congress's intent and the influence that Dodd-Frank and everything else did to the National Bank Act isn't informed or involving? No, we absolutely take that into account. I just wanted to say we don't start at Dodd-Frank. We start at the National Bank Act. And what we have here is Section 371 that expressly grants national banks the power to make real estate lending. That, over the past century, has been amended a dozen times. For a significant period of time, there was a limitation in there requiring national banks to comply with some state laws and some circumstances. The law, 371 now, is just like the provision at issue in Barnett Bank, in that it is an incredibly broad grant of power. When you look at Dodd-Frank, I think we all need to look at it against the backdrop of Barnett Bank, which I see I'm over time, if I can finish the answer. The Supreme Court said to Congress, we recognize that when you want to require national banks to comply with state law, you couple both an express grant of power with an explicit limitation on power. The Supreme Court listed four or five examples of provisions where the requirement to comply with state law is in the same provision of the National Bank Act granting the power. And what the Supreme Court said, when you do that, Congress, we are going to give effect to that. But when you don't, when you don't explicitly limit the exercise of national bank powers on compliance with state law, we're ordinarily going to conclude that state law doesn't apply. We would only find that it applied if there was not a significant interference, which the Supreme Court in Barnett Bank tied back to Franklin National Bank. And that's why we say, when you read 1639 D.G. 3 as not containing an explicit statement, the national banks must comply with state law, which is what the district court agreed with us on, then you're in the Franklin National Bank world, and we think that the limitation here is greater than in Franklin National Bank. Thank you, Your Honor. Thank you. We'll hear from the appellee. Thank you, and may it please the court. Jonathan Taylor for the plaintiffs in these two consolidated cases. And before I jump in, I want to thank the court and my friends on the other side for the accommodation this morning. It's very much appreciated. I'd like to begin with what I think is common ground, which is that the issue in this appeal is one of congressional intent, as you noted, Judge Perez, and specifically whether Congress intended to authorize national banks to violate otherwise applicable state escrow interest laws. And two provisions in Dodd-Frank make clear that Congress did not intend that result. My friend thinks Dodd-Frank has nothing to say about the question in this case, but that couldn't be further from the truth. The first thing that Congress said in Dodd-Frank is what it thought about the preemption regime for state consumer financial laws as applied to national banks, and the second is what Congress said specifically about state escrow account laws. And if I may, I'd like to take those two in turn, beginning with the preemption regime. And my friend didn't talk a lot about this regime, but I think it's important, so I want to take a little bit of time to go through it. I'm going to be referring to Section 25B here in some detail, and I think if you have it in front of you, it will be helpful to follow along. This is a centerpiece of Dodd-Frank, and it's an unusual, carefully articulated set of interlocking provisions that speak directly to both the substantive preemption standard and the role of the OCC. Subsection A defines the subject matter, national banks and state consumer financial laws. Subsection B1 then sets forth the preemption standard. It says state consumer financial laws are preempted only if one of three things is true. The first is when the state law has a discriminatory effect on national banks. Nobody contends that that is true here. The second is when the law is preempted by Barnett Bank, which is why we're here, and the third is a catch-all that preserves preexisting preemption regimes that have nothing to do with national banks, for example, the federal arbitration. The text and structure of this provision, subsection B1, make clear that state consumer financial laws are not invariably preempted under Barnett Bank, which I think is the upshot of Bank of America's position. Otherwise, this entire provision would make no sense. And subsection B4 confirms that the National Bank Act, quote, does not occupy the field in any area of state law, and that includes the area of state consumer financial laws. Now, section 25B's other core purpose is to rein in the OCC, which in Congress's view had preempted too many state consumer financial laws. In subsection B1B, which we were just talking about, the one that governs the substantive standard for Barnett Bank, it grants a limited authority to the agency to make a preemption determination that a state consumer financial law is preempted under Barnett Bank, but only on a case-by-case basis, and under subsection B3, that requires an assessment of the impact of the particular state consumer financial law on national banks. And it allows for preemption of more than one law only with CFPB consultation. And then, finally, there are two subsections of this provision that govern a reviewing court, this court included, that are fully applicable here. One is subsection C, which prohibits a court from giving effect to any OCC preemption determination under Barnett Bank as to a, quote, provision of a state consumer financial law in less substantial evidence made on the record of the proceeding supports the finding regarding the preemption of that provision. The OCC didn't identify any substantial evidence here, and there's no specific finding that New York's law in particular satisfies or fails the Barnett Bank standard in any event. So under this provision, the OCC's regulation cannot be given effect by this court. And, moreover, this provision shows once again that Barnett Bank's standard doesn't require invalidation of all state consumer financial laws, quite the opposite, or else this provision, again, would be entirely pointless. And then, finally, subsection B5A, sorry, there are a lot of subsections here, says that a court reviewing any OCC Barnett Bank determination, even if the agency made a specific finding based on substantial evidence, shall give that determination only in more deference. And so I think I'll turn now in just a moment to the application of the standard to the particular question in this case. But I think, first, the predicate that I think is important for this court to understand is that as these various subsections are applied to this case, section 25B makes two things clear. The first is that the OCC's categorical preemption determination, which is based on no substantial evidence, no other source of preemption authority, contains no reasoning to defer to, that has no bearing on this case. And the second is that Bank of America's exceedingly broad view of Barnett Bank preemption, and the OCC's too, for that matter, cannot be correct. I don't read your adversary's argument, at least this morning, as resting very heavily on Skidmore deference or the OCC, but on Franklin National Bank and determination of just what a significant interference is. I think that's right. It's such a complex statutory regime. I wanted to just make that clear to the court, and I'm happy to talk about the application of the standard now, once we agree that that's the standard and it leaves ample room for enforcement of state consumer financial laws. Now, my friend, you're right. It places heavy reliance on the Supreme Court's decision in Franklin. I actually think Franklin is helpful for us in the sense that it defines the relevant power in that case, the power that you're assessing to determine whether it is prevented or significantly impaired by. It defines that power by reference to what Congress has done. And so what happened in that case is the Federal Reserve Act expressly authorized national banks to receive savings deposits. And the question was whether that express grant of statutory authority, whether that was significantly interfered with by a state law that prevented national banks from using the very word that Congress itself used. And what the Supreme Court said there is there's a clear conflict. That's the language it used at page 378 of the opinion, because Congress has given a particular label to this type of account, and the state sought to prevent banks from using that label, not just in their advertising, but in their business operations. What about waters? Could you address that? Because that seemed to – the Supreme Court there seemed to define significant interference in a way the language here curtails or hinders the efficient exercise of a national bank power. And that seems like a softer standard than the one that you're, I guess, advocating for from the word significant interference. Yeah, I guess the first thing I would say is when Congress selected the preemption standard, it didn't say the standard articulated by the Supreme Court in waters. And separately, in fact, it overturned the core holding quarters, which is that the subsidiaries of national banks enjoy a National Bank Act preemption. Well, but – Instead, what Congress said is that – Do you agree that the statute doesn't – it imports Barnett Bank and it didn't change before and after Dodd-Frank, right? It imports Barnett Bank's articulation of the standard, and I think Congress understood what that meant. And yes, it also would presumably import the Supreme Court's existing cases, certainly prior to Barnett Bank. Well, it would be odd for it not to import waters and that apply only in the, I don't know, 2007 to 2000 for a couple of years, and then it doesn't. Is that your position? Well, I think the – Congress tells us exactly what the standard is and its prevents or significantly impairs, and I don't take waters to – and Justice Ginsburg herself, who was the author of that opinion, she said this during argument in the Cuomo decision a couple of years later, shouldn't read it out of the narrow context in which the court was deciding the particular question in the case, and it didn't purport to alter the standard in Barnett. To the contrary, it applied it, and what it relied on there in that case, too, to define the relevant power was the express power granted by statute, and it read that statute a particular way. No, I was going to say – I'm sorry. Please finish that. I didn't mean to interrupt. It's just hard to jump in here. No, no, no. Please go ahead. Can you articulate or discuss whether or not you think that the question of significant interference under Barnett Bank is purely a question of law? Like, is there any fact-finding that needs to be done to determine that 2 percent versus 1 percent versus 15 percent is not a fact that needs to get found? I think the ultimate question is one of law, but it could depend on the facts on the ground. I mean, you can imagine an escrow account interest law, not like the one at issue here, which was in place – has been in place for 50 years and was in place at the time of Dodd-Frank when Congress imported those state law requirements and made them part of federal law, and I'm happy to talk about that in a minute. But I think that if you look – if you're making that determination, if a state did go further and had some outrageously high interest rate, I think the National Bank would be allowed to put on evidence to show that it's punitive, and that's consistent with the congressional design as well. As I was mentioning earlier, there's the substantial evidence provision. It's part of Dodd-Frank, which contemplates that the agency, when it makes a preemption determination, will do so based on substantial evidence that – made on the record of the proceeding that supports the specific finding of preemption, and maybe that's just consultation to various legal provisions, but presumably would also be some effort to ascertain the facts on the ground and to connect them up with the legal standard and explain why there's significant interference. And I would note that Bank of America's made no effort to show that this particular interest rate significantly impairs the exercise of their power. And as I understand their position, which is the same as the OCC's position, is that even a nominal interest rate, 0.01 percent, that that interferes with the power as they narrowly define it. And I think the power as defined by Congress, which is the relevant actor here, is simply the power to make real estate loans. And if that's the power, there's no argument that that has been prevented or significantly impaired by the law here. I would also note that even if you wanted – I'm wondering, is there a reason why this suit is coming now? The GOL 5601 was almost 50 years old. What was the status of escrow interest for the past couple of decades? It's a good question. I think that one relevant action here was what the OCC did in 2004, and that certainly purported to preempt this kind of law. And my understanding is that while that regulation was in effect, national banks weren't complying with these laws. And there wasn't – I don't think that there was much litigation, at least under the National Bank Act, seeking to enforce these particular laws. That's changed now that Dodd-Frank has clarified the scope of preemption in this area. As to what the status was in the 70s and 80s, I'm not quite sure. But I think right now some banks are complying with it, and obviously some are not. Now, just to kind of get back real quickly, if I may, to what I think is really the question for this court, which is sort of articulating the power and then determining whether it's been prevented or significantly interfered with, even if you thought that was a close case, just looking at the regulation that just repeats the statutory power of real estate lending and then trying to determine whether that power is significantly interfered with, I think what cinches it here, it is at the very same time that Congress was curtailing OCC preemption authority and at the very same time that it was making clear that state consumer financial laws would have a significant role to play, even with respect to national banks, it adopted a particular provision that I think could not be clearer, that at least as a matter of federal policy, it is perfectly consistent with federal policy that these laws are enforced against any creditor. And in fact, it makes that a matter of federal law for the majority of mortgage loans. And so I think that given, particularly given that, which distinguishes this case from all the cases relied on by my friend on the other side, I think that this court can issue a narrow decision, avoid a circuit split and should affirm the judgment below. If there are no more questions. Thank you. We'll hear rebuttal. Thank you, Your Honor. I'll start with waters. I mean, one of the arguments we heard this morning is for purposes of preemption that the plaintiffs seem to take the position it matters whether you're talking about an express or an implied power. And they tried to describe Franklin National Bank as the preemption is turning on the express power to take deposits. I think Franklin National Bank itself shows that what really was at issue was the implied power to advertise. But let me just read the Supreme Court's decision in waters, the parenthetical for Franklin National Bank and how the Supreme Court described it. Local restrictions preempted because they burdened exercise of National Bank's incidental power to advertise. That's consistent with a number of cases, including the Gutierrez case from the Ninth Circuit, that when they look at the National Bank power for purposes of preemption, they look at the power that aligns with the state restriction. In Gutierrez, what the Ninth Circuit held is that a state law restriction on a National Bank's choice of posting order was restricted. I mean, that's a pretty, like, finely defined power, but that's because the state law claim there was trying to impose a particular posting order on National Banks. And so they didn't just rely on the broad power, express power to take deposits. They looked at the power that most closely aligned to the restriction. They looked at implied powers. Those are just as have the same preemptive force. Could you respond to the argument he would make that that was in a situation where there wasn't a particular part of Dodd-Frank that said that was entitled the applicability of payment of interest? And it says it prescribed by applicable state or federal law. So we read that provision, which the district court agreed with us on that, is not imposing a new and an independent obligation to pay interest. The phrase both at the beginning, if prescribed by applicable law, then it says pay interest in accordance with the applicable law, means that there necessarily must be another source of law imposing the obligation. Like state law, like G.O.L., right? Right, which then that just, right, then that turns, makes the whole issue turn on the application of Barnett Bank. Because if the state law is preempted as to national bank, there is no applicable state or federal law for national banks to follow. I guess we keep getting back to significant interference. But I would still read that provision to suggest that Congress believes that not all mortgage escrow interest laws are a significant interference. So why is, so what about, so if I'm right about that, or if I, you may say as a class, they're all a significant interference. But let's say I stick with my idea that maybe some are, some aren't, and I'm going to read that provision to say that. What is about, what is about this 2% law that would distinguish it from other mortgage interest laws? I mean, first of all, if we're getting into 69 D.G. 3, I don't want to be remiss to point out that it doesn't apply to any of the people here. So Congress did not make a choice that we should comply. I'm not applying it. I'm just saying it tells me something about what Congress said about the class. So Congress, Congress made a determination that some lenders should pay interest under that. I mean, this necessarily sweeps in state chartered, non-depository lenders. And that was an important part of Dodd-Frank, because these were state institutions that weren't previously governed by federal law. And they made a lot of the subprime loans. By having this provision, that sweeps them in under the, like, regulatory authority of CFPB. So it still does that. I want to go back to the point. I tried to make it earlier, but I want to repeat it. Whatever you think of 1639 D.G. 3, I don't read it, and other cases haven't, I haven't really looked at congressional statements this way as expressing Congress's view on prevent or significantly interfere. Right, if you look at some of the core provisions of the National Bank Act, like the power to charge interest or to have subsidiaries or to have, like, branch locations, when it says that a national bank should comply with state law, courts have never looked at that and said, well, that must mean that Congress thinks that that limitation is not a significant interference, and so then we should judge based on that. What it actually is, it's just Congress granting a limited power. And this is kind of the key part of Barnett Bank of saying, has Congress granted a broad power or has Congress granted a limited power? And when Congress grants a power to make loans but to do so in compliance with state law, then Congress has granted a narrow power. And so state law applying isn't interfering with the grant of Congress's grant of power because Congress just granted a narrow power. When Congress doesn't have that, when you have a provision like 371 that says national banks can make real estate loans, the only limitations are kind of federal regulations. The OCC is entitled to adopt regulations, but it says nothing about state law limitations. That's a broad power. Congress has intended a broad power. And so we would say that under Franklin National Bank that would be preempted. Thank you, Your Honor. Thank you both. Nicely argued, and we will take the matter under advisement. That's the only argued case this morning, or two argued cases. So I'll ask the clerk to adjourn court. Court stands adjourned. Thank you all.